**ANDERSON v. BOWERS.**

**Civil Action No. 1578.**

District Court, E. D. South Carolina, Florence Division.

May 18, 1948.

John D. Nock, of Cheraw, S. C., for plaintiff.

Ben Scott Whaley, U. S. Atty., and Louis M. Shimel, Asst. U. S. Atty., both of Charleston, S. C., and Rhodes S. Baker, Jr., Sp. Asst. to Atty. Gen., for defendant.

WARING, District Judge.

Plaintiff, Maggie F. Anderson, a resident of Cheraw in Chesterfield County, South Carolina, in March 1942 filed her Federal Income Tax Return for the calendar year 1941 with the defendant as the Collector of Internal Revenue for the District of South Carolina, and included in said Return as an item of income was the following: "Administratrix Fee—J. L. Anderson, Est. $25,106.99."

It appears that J. L. Anderson died testate in Cheraw, Chesterfield County, South Carolina on February 18, 1940, leaving surviving him his widow, the plaintiff herein, and two sons and two daughters. By his Will the entire estate was left to his widow with the exception of the forgiveness of certain indebtedness owed to him by his four children. The plaintiff was named as sole executrix and qualified. She filed an accounting in the Probate Court and the estate was closed and she discharged as executrix by order of the Probate Court on February 28, 1941. Federal Estate Tax had been filed on February 12, 1941, and payment made of the amount of tax, according to the calculations on the Return. On "Schedule J" of the Return the amount of executrix' commissions is shown as $25,106.99. It appears that in preparation to wind up the estate the balance then on hand in the bank to the account of the estate was divided amongst the parties claiming to be entitled thereto by drawing to the order of each of the children a check in the sum of $4,596.83 (one of these checks was $4,596.82) and a fifth check to the plaintiff. This check, drawn in her name "Maggie F. Anderson," is dated February 28, 1941, and is for the amount of $25,106.96 (The receipt hereinafter refered to and tax Returns show the amount to be $25,106.99. This slight difference is probably some clerical error and is immaterial.) The check was signed "Maggie F. Anderson, Executrix Estate J. Liston Anderson, Deceased," and bears a notation "Exrs. Com." There appears the endorsement on the back, "Maggie F. Anderson," and the bank perforation showing the time of cashing is "3-15-43." Under the same date as that of the check, namely, February 28, 1941, a receipt for $25,106.99 for "Executrix's Commissions" was executed in the name of Maggie F. Anderson by her son W. G. Anderson who generally looked after her business affairs. It appears that on March 15, 1943, a new account was opened in the South Carolina National Bank entitled "J. L. Anderson Tax Account" and the above named checks, aggregating the sum of $43,494.27, were deposited. Apparently a check was drawn for the sum of $43.994.27 which was a payment to the Commissioner of Internal Revenue for estate taxes, and as this created an overdraft on the bank statement on March 29, the next day a deposit of $500 was made and the account closed.

From the testimony, it appears that Mrs. Anderson had little if any part in the managing of the affairs of the estate. Her husband and the four children had been partners in business and upon his death they continued the business, she inheriting a one-fifth interest. The business seems to have been run entirely by the children and the estate matters by them under the advice and direction of their attorney, Mr. Nock, and a tax consultant, namely, Mr. L. C. Dodge, a certified public accountant of Spartanburg, South Carolina. The five checks were drawn by Mr. Nock on or about February 4, 1941, and sent by him to Mrs. Anderson, who was temporarily absent from home and visiting in Florida. He directed her to sign the checks and various estate documents, including the Return to the Probate Court in preparation for application for discharge on February 28, 1941, the same date as the checks and receipt above referred to. Mrs. Anderson apparently signed these papers and returned them to Mr. Nock. The proceedings in the Probate Court were carried forward, the accounts filed, receipts exhibited, and the discharge obtained, declaring the estate closed; and among other items was an allowance of executrix' commissions in the amount heretofore set forth. It appears that the tax consultant had advised that there might be some question as to some of the tax liability, particularly in view of some gifts that might be claimed to have been made in contemplation of death, and of course if the Commissioner of Internal Revenue had assessed an additional tax, the estate having been closed, claim would come back upon the beneficiaries. It was therefore deemed expedient to retain the five checks in a safe in the office of the partnership business. One of Mrs. Anderson's sons testified that this was done on the advice of Mr. Nock, but it is indefinite as to exactly by whom or how it was brought about. Mrs. Anderson said she was not familiar with these matters and left the direction of it to her children and their advisors.

Now, while this check was never cashed by Mrs. Anderson, she certainly had a right so to do if she had wished. Some question has been made as to whether there was actual delivery. Of course if the money had been retained in the estate, it might be argued that no delivery was made, but the checks were drawn, the receipt signed, the Returns made to the Probate Court, all for the purpose of ending the estate, and when the executrix had once been discharged and these checks issued, there was no longer any estate in existence to retain any control or direction over the funds. If Mrs. Anderson had chosen she could have presented this check for payment and demanded payment. It is true the physical custody of the check was in the hands of her sons and those in charge of the business, but this custody had been created voluntarily by her and they were her agents and acting for her. Therefore their custody was her custody and she had a right at any time to take the check out of the safe since she was an equal partner in the business and since the Probate Court had allowed this amount to her. Or she could have gone further if she wished and herself drawn a new check, presented it to the bank, and withdrawn the moneys. And she was the only person that could sign checks on the estate account or direct the payment of the money. It is quite apparent that the arrangement by which these checks were held was one of convenience and protection to all parties because of the possibility of further tax liability. In fact, the tax consultant said that he apprehended that the government would make a claim since there had been a gift by the decedent on his deathbed, and while he considered it legitimate to make the claim, he believed there was great probability that the government would refuse the claim and make an additional assessment. And also there was certain litigation in regard to transactions with the decedent which might cause some further tax liability. And so it is clear that these parties who would have to make up contributions for the purpose of meeting any future tax liability determined that they would protect themselves against each other by holding the checks in one common fund, subject to use in the future. But it must be reiterated that this was a voluntary agree-

ment and each party and particularly the executrix was entitled as a matter of right at that time to cash the check.

Upon auditing the estate Returns, the Commissioner of Internal Revenue disallowed certain items and increased the tax liability of the estate and in March 1943, as heretofore stated, the above referred to checks were all deposited in the special tax account in the South Carolina National Bank and a check drawn paying the additional assessment and $500 additional added to the account to take care of the overdraft created by such check. This was contributed from the business so that it would appear that all of the items going into this deposit were contributions from the parties themselves and not a revocation of the amounts which they had claimed and for which they had received the checks. The accountant representing the estate investigated this matter of re-assessment and made some protest; but it is definitely agreed and stipulated that the matter is now closed and no court action has been taken and no further question can be made as to the tax assessment against the estate.

Among other items disallowed by the Commissioner of Internal Revenue in re-assessing the estate was a portion of the commissions claimed and received by the executrix. The Commissioner held that the executrix was not entitled to the amount for which the check above referred to had been drawn, but that the limit of commissions properly payable to her was $6,608.50, and so he disallowed from this claim for commissions the sum of $18,498.49. Mrs. Anderson within due time filed a claim for a refund of the income tax paid by her for the year 1941, basing it upon a reduction in her income in the last above stated amount, which she claimed would reduce the amout due by her as tax on income for the year 1941 by the sum of $10,072.74. Due administrative procedure was had in regard to this matter and claim refused, and the plaintiff has now brought suit for the said sum of $10,072.74, with interest from March 15, 1942, the date that the income tax was paid.

The position of the plaintiff is that, first, she has never received the executrix' commissions (called "Administratrix Fee" in her income tax Return) in the sum of $25,106.99 since the check was drawn and turned back to her family for safekeeping with other checks; and secondly, that since she did not actually cash the check and it has been later determined that she was not entitled to that amount of commissions, she is entitled to a refund on her taxes for 1941.

On the other hand, the government's position is that the check was signed by her and was to her own order and that she could have used it if she saw fit and she chose not to draw out the money but allowed it to be kept in the safe of the business of which she was a partner. That that was a voluntary action subject to revocation by her at any time and she had full control and custody of this money, and either actually or constructively received that amount for the calendar year 1941, and that though she did turn that amount back it was only as a contribution to the tax liability which she as the sole beneficiary of the estate must have had to make in any event, and it was entirely optional with her as to whether she should have cashed the check and spent or otherwise used the $25,106.99 and later made a contribution of a similar sum from any source that she chose. The government concedes that she might readily have had a valid claim for a refund on the income tax paid by her for the calendar year of 1943 since that is the year in which she paid this money to the government.

The plaintiff bases her contention mainly upon the broad equitable ground that one should not be forced to pay income taxes upon something that she did not receive. But on the other hand, we must realize that income taxes are a matter of annual accountings, and when one receives moneys in one year which in a subsequent year she may be forced to return, generally the deduction must be claimed in the subsequent year when the actual payment is made, provided she did receive and had the power to make use of the moneys in the earlier year, irrespective of what she may have voluntarily chosen to do with such funds.

In the case of North American Oil Consolidated v. Burnet, 286 U.S. 417, 424, 52 S.Ct. 613, 615, 76 L.Ed. 1197, the court says:

"If a taxpayer receives earnings under a claim of right and without restriction as to its disposition, he has received income which he is required to return, even though it may still be claimed that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent. See Board v. Commissioner, 6 Cir., 51 F.2d 73, 75, 76. Compare United States v. S. S. White Dental Mfg. Co., 274 U.S. 398, 403, 47 S.Ct. 598, 71 L.Ed. 1120. If in 1922 the government had prevailed, and the company had been obliged to refund the profits received in 1917, it would have been entitled to a deduction from the profits of 1922, not from those of any earlier year."

And in the case of Penn v. Robertson, 115 F.2d 167, at page 173, Judge Chesnut, speaking for the Circuit Court of Appeals for the Fourth Circuit, says:

"There are some principles of income tax accounting applicable to this case now well settled by decisions. In general the income tax law is concerned only with realized gains and losses, Lucas v. American Code Co., 280 U.S. 445, 449, 50 S.Ct. 202, 74 L.Ed. 538, 67 A.L.R. 1010; and where, as in this case, the taxpayer's accounts are kept on a cash basis and not on an accrual basis, he receives taxable income only when it actually comes into his possession or, if only constructively received, when the amount is definitely ascertained and subject to his unrestricted control. North American Oil Consolidated v. Burnet, 286 U.S. 417, 52 S.Ct. 613, 76 L.Ed. 1197; Lynchburg Trust & Savings Bank v. Commissioner, 4 Cir., 68 F.2d 356, certiorari denied 292 U.S. 640, 54 S.Ct. 773, 78 L.Ed. 1492. But in view of practical necessities, income tax accounting with the Government must be on an annual basis, Burnet v. Sanford & Brooks Co., 282 U.S. 359, 51 S.Ct. 150, 75 L.Ed. 383; Heiner v. Mellon, 304 U.S. 271, 58 S.Ct. 926, 82 L.Ed. 1337; and, therefore, moneys received by a taxpayer as his own under a claim of right and without restriction as to their disposition are taxable for the year in which they are received and retained even though in a later year the taxpayer is obliged to refund them in whole or in part, in which event he would have a claim for deduction in the later year. Burnet v. Sanford & Brooks Co., supra; Brown v. Helvering, 291 U.S. 193, 54 S.Ct. 356, 78 L.Ed. 725; Saunders v. Commissioner, 10 Cir., 101 F.2d 407."

See also Hedrick v. Commissioner of Internal Revenue, 2 Cir., 154 F.2d 90, and Saunders v. Commissioner of Internal Revenue, 10 Cir., 101 F.2d 407.

When the check for the executrix' commissions and the other checks were put in the safe, no liability had as yet attached for extra assessment. The parties were, out of an abundance of caution, putting aside funds for a future contingent liability. If there had been no assessment and claim by the Commissioner against the estate, the checks would of course have been cashed and used. And it must be remembered that the liability was not established until 1943 and that in 1941 there was only a contingency. As was said by Mr. Justice Brandeis:

"Except as otherwise specifically provided by statute, a liability does not accrue as long as it remains contingent." Brown v. Helvering, 291 U.S. 193, 200, 54 S.Ct. 356, 360, 78 L.Ed. 725.

And the same Justice, speaking for the Supreme Court in Heiner v. Mellon, 304 U.S. 271, at page 276, 58 S.Ct. 926, at page 929, 82 L.Ed. 1337, says:

"Losses suffered by a taxpayer in a later year may be deducted from profits, if any, earned by him in that later year; but the tax on a year's income may not be withheld because losses may thereafter occur."

Of course if the estate had not been closed and the checks issued, and the funds had been held intact, the income tax Return of Mrs. Anderson would not have shown the payment of $25,106.99 in 1941, and she never would have had to make claim for refund then or any subsequent year. Perhaps it was an erroneous method of handling the estate but after all a party is responsible for the acts of her agents and advisors, and although we may now see where better methods could have been

used and some of this taxation saved, it is too late to go back and rearrange the business set up. The estate was closed, the executrix dismissed, a check issued for her commissions, a receipt signed for the same, and an income tax Return shows that she had received it. That she was forced to make a contribution in this same amount and chose to use the same check, rather than other assets, in 1943, does not affect her tax liability as of 1941. Although not necessary to decide that point, it appears to me that she clearly had a right to file an amended Return for 1943 claiming a credit for payments made by her in that year, and this decision is in no way to be construed as depriving her of any right she may have in that respect.

Almost all tax cases are hard cases, and when a taxpayer, through mistaken or ill-advised methods, pays more than she might have been charged with if the tax matters had been more skillfully handled, nevertheless, she must stand or fall according to the law and be governed by her own acts and the acts of her agents and advisors.

I am of the opinion that the claim must be refused and the suit dismissed. Appropriate findings of fact, conclusions of law, and an Order will be filed.